# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent/Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 02-40157-03-JAR** |
| | ) | **11-4036-JAR** |
| **CLIVE HAMILTON,** | ) | |
| | ) | |
| **Petitioner/Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on petitioner Clive Hamilton's Motion under 28 U.S.C.

§ 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc. 990).  In

his motion, Hamilton seeks relief on numerous grounds: that he was denied effective assistance

of counsel, that his Indictment was defective and that he should not have been charged in federal

court.  The government has responded (Doc. 1021) and Hamilton has filed a traverse (Doc.

1027).  After a careful review of the record and the arguments presented, the Court denies

Hamilton's motion without further evidentiary hearing.

## I.     Legal Standards

Under § 2255(a):

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws
> of the United States, or that the court was without jurisdiction to
> impose such sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to collateral
> attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

According to Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States

District Courts:

> The judge who receives the motion must promptly examine it. If it
> plainly appears from the motion, any attached exhibits, and the
> record of prior proceedings that the moving party is not entitled to
> relief, the judge must dismiss the motion. . . .

An evidentiary hearing must be held on a § 2255 motion "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."[1]  Petitioner must allege facts which, if proven, would warrant relief from his conviction or sentence.[2]  An evidentiary hearing is not necessary where the factual allegations in a § 2255 motion are contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact.[3]

A district court may grant relief under § 2255 if it determines "that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."[4] "Review under § 2255 is not an alternative to appellate review for claims that could have been presented on direct appeal but were not."[5]  A movant may overcome this procedural bar by

---

[1] 28 U.S.C. § 2255(b)

[2] *See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996).

[3] *Arredondo v. United States,* 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)); *see also Hatch*, 58 F.3d at 1471 ("the allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims which are merely conclusory in nature and without supporting factual averments).

[4] 28 U.S.C. § 2255.

[5] *United States v. Magleby,* 420 F.3d 1136, 1139 (10th Cir. 2005), *cert. denied,* 547 U.S. 1097 (2006).

showing either of "two well recognized exceptions."[6]  First, the movant must show good cause for not raising the issue earlier and actual prejudice to the movant's defense if the issue is not considered.[7]  Cause may "be established by showing that counsel rendered constitutionally ineffective assistance."[8]  Second, the "failure to consider the federal claims will result in a fundamental miscarriage of justice.'"[9]

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his *defense.*"[10]  A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[11]  First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[12]  To meet this first prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."[13]  This standard is "highly demanding."[14]  Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not

---

[6]*United States v. Cervini,* 379 F.3d 987, 990 (10th Cir. 2004), *cert. denied,* 544 U.S. 904 (2005).

[7]*Id.*

[8]*United States v. Wiseman,* 297 F.3d 975, 979 (10th Cir.2002) (citations omitted).

[9]*Cervini,* 379 F.3d at 990 (quoting *Coleman v. Thompson,* 501 U.S. 722, 750 (1991)); *see Bousley v. United States,* 523 U.S. 614, 621–22 (1998) (holding that a showing of actual innocence meets the fundamental miscarriage of justice prong).

[10]U.S. Const. amend. VI; *Kansas v. Ventris,* — U.S.—, 129 S. Ct. 1841 (2009).

[11]466 U.S. 668 (1984).

[12]*Id.* at 688.

[13]*Id.* at 690.

[14]*Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

merely wrong, so that [they] bear no relationship to a possible defense strategy."[15]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[16]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error; "every effort should be made to 'eliminate the distorting effects of hindsight.'"[17]

Second, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[18]  To prevail on this prong, a defendant "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[19]  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[20]  This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[21]  A defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[22]

---

[15]*Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

[16]*Strickland*, 466 U.S. at 689.

[17]*Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

[18]*Strickland*, 466 U.S. at 687.

[19]*Id*. at 694.

[20]*Id*.

[21]*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

[22]*Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (quoting *Strickland*, 466 U.S. at 697) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever

Finally, Hamilton appears *pro se*. Therefore, his pleadings are to be construed liberally and not to the standard applied to an attorney's pleadings.[23] If a petitioner's motion can be reasonably read to state a valid claim on which he could prevail, the court should do so despite a failure to cite proper legal authority or follow normal pleading requirements.[24] However, it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant."[25] For that reason, the court shall not supply additional factual allegations to round out a petitioner's claims or construct a legal theory on his behalf.[26]

## II.    Procedural Background

On April 20, 2005, the Topeka, Kansas grand jury returned a five-count Third Superseding Indictment, which charged petitioner in Count One with conspiring with each of the ten named co-defendants, and with others, to distribute controlled substances, including but not limited to more than 1000 kilograms of marijuana and more than five kilograms of cocaine, beginning sometime prior to January 18, 1994 and continuing to November 5, 2003, in violation of 21 U.S.C. § 846.[27] Counts Two through Four did not pertain to petitioner, but he was named in Count Five, which charged criminal forfeiture of assets attributable to the conspiracy charge.[28]

---

*Strickland* prong is the easier to resolve.").

[23]*Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[24]*Id.*

[25]*Id.*

[26]*See Whitney v.New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997).

[27]Doc. 264.

[28]*Id.*

On October 26, 2005, a jury trial commenced in Topeka, Kansas, where petitioner was tried jointly with co-defendant Dean Dormer. The jury returned a verdict of guilty as to both defendants on November 9, 2005.[29] In addition to finding petitioner guilty of the charged conspiracy, the jury determined beyond a reasonable doubt that he conspired to distribute "1,000 kilograms or more" of marijuana.[30] On August 21, 2007, this Court sentenced petitioner to 360 months' incarceration.[31]

Petitioner directly appealed his conviction to the United States Court of Appeals for the Tenth Circuit, which affirmed his conviction in a published opinion on November 5, 2009.[32] On January 6, 2010, the Tenth Circuit issued its mandate,[33] and on March 16, 2010, petitioner filed a petition for writ of certiorari with the Supreme Court, which was denied on June 14, 2010.[34] Petitioner timely filed this motion on April 1, 2011.[35]

## III.    Facts of the Case and Trial Proceedings

Because of the expansive nature of petitioner's claims, a review of the underlying facts and background of the case and trial is informative.

### *Salina, Kansas Airport Seizure*

---

[29]Doc. 482.

[30]*Id.*

[31]Doc. 745.

[32]*See United States v. Hamilton*, 587 F.3d 1199 (10th Cir. 2009).

[33]Doc. 934.

[34]Doc. 961.

[35]Doc. 990. Section 2255 motions have a one-year limitations period from the date the judgment of conviction becomes final. 28 U.S.C. § 2255(f)(1).

On December 23, 2002, DEA agents received a tip about a suspicious charter flight that was expected to land and refuel in Salina, Kansas, at around 4:30 a.m.[36]  Agents met the flight and found thirteen bales of marijuana stored in the luggage and boxes in the aircraft.[37]  Each bale weighed 45-50 pounds.[38]  The two passengers on the aircraft were co-defendants Troy Barker and Ondreya Bruce, and agents arrested them for possession with intent to distribute marijuana.[39]

### *Van Nuys, California Airport Encounter*

The following day, December 24, 2002, co-defendant Dormer called the Los Angeles Police Department ("LAPD") and reported to Officer Jason Blakely that his vehicle, a Cadillac Escalade, had been stolen.[40]  Dormer reported that his vehicle was stolen sometime between 6:00 and 6:30 p.m. on December 23, 2002, from a location in Los Angeles.[41]  He reported that the last driver of the vehicle, Cherise Walton, had left the vehicle unlocked and upon returning to it, the vehicle was gone.[42]  He advised that no one had permission to take the vehicle.[43]

Later that day, LAPD Officer Kenneth Boyles received a call from his dispatch, advising that the vehicle had been located and was at the Van Nuys airport in the Los Angeles

---

[36]Doc. 685 at 91, 101-02.

[37]*Id*. at 121-28, 134.

[38]*Id*. at 128.

[39]*Id*. at 149.

[40]Doc. 688 at 830, 833-34.

[41]*Id*. at 833-34.

[42]*Id*. at 836-40.

[43]*Id*. at 837.

metropolitan area.[44]  Officer Boyles went to this airport at approximately 7:00 p.m., where he

found the vehicle.[45]  The vehicle was parked on the airport grounds behind Raytheon company, a

private company that charters flights to various places around the country.[46]  This area was a

secured location.[47]  A black Cadillac Escalade EXT was parked next to the stolen vehicle.[48]

At the scene, Officer Boyles spoke with a supervisor from Raytheon, who advised that

four individuals had arrived in the two Cadillac Escalades and had chartered a flight to

Cleveland, Ohio; and that a "Mr. Hamilton," was listed on the log as a driver of the stolen

vehicle.  This employee advised that the chartered plane would be returning from Cleveland in a

couple of hours.[49]  Officer Boyles thought this presented an opportunity to catch the individuals

who had stolen Dormer's vehicle.[50]

Officer Boyles telephoned Dormer and advised him that officers had recovered his

vehicle.[51]  Dormer explained to Officer Boyles that his vehicle had been stolen after his wife had

parked it in the Los Angeles area with the engine running and left it for a couple of minutes to

talk to a friend in a shop.[52]  Dormer's wife, Cherise Walton, also spoke to Officer Boyles and

---

[44]*Id*. at 845.

[45]*Id*. at 845-48.

[46]*Id*. at 848.

[47]*Id*. at 851-52.

[48]*Id*. at 850-51.

[49]*Id*. at 855-56.

[50]*Id*. at 856.

[51]*Id*. at 857.

[52]*Id*.

repeated this story.[53]  Officer Boyles advised both Dormer and Walton that he was at the Van Nuys airport and had a good chance of catching the perpetrators.[54]

Five to ten minutes later, Walton called Officer Boyles.[55]  Walton told the officer that they just wanted to come and pick up the vehicle and were not interested in prosecuting the people who stole it.[56]  Five to ten minutes later, Walton telephoned Boyles again and explained that she was having a business dispute with someone and did not want to prosecute, but declined to reveal the name of the person.[57]  The flight landed at about 9:00 p.m. and pulled in behind the Raytheon building.[58]  The officers saw three individuals, Brian Diaz, Sean Gayle and petitioner, disembark a Lear Jet and walk toward the Escalades.[59] Petitioner was in possession of a large stroller suitcase and walked toward the driver's side door of the stolen Escalade.[60]

Officers contacted the three individuals as they approached the Escalades.[61]  The officers asked them who was the driver of the stolen Escalade, and Diaz replied that the vehicle belonged to him.[62]  Diaz explained to Officer Boyles that he knew Dormer, that he had been making

---

[53]*Id*. at 860.

[54]*Id*.

[55]*Id*. at 862-64.

[56]*Id*. at 863.

[57]*Id*. at 865-66.

[58]*Id*. at 871.

[59]*Id*. at 873, 875, 885.

[60]*Id*. at 873-75.

[61]*Id*. at 876.

[62]*Id*. at 876-77.

payments on the vehicle for the past year, that Dormer was the registered owner, and he had not had contact with Dormer for the last six months.[63]

### *Arrest and Search of Petitioner at the Van Nuys Airport*

As the officers were speaking with Diaz, Sergeant Cueto saw petitioner walking to the rear of the Escalade, as if "trying to avoid the police," so he told him to walk around the vehicle to the driver's side where Gayle and Diaz were. Up to this point, the officers had not handcuffed anyone, but Sergeant Cueto eventually ordered that the suspects be handcuffed because they were "extremely nervous," they "were moving their hands around," petitioner "was looking around almost like looking for a place to run," and they were giving contradictory stories.[64] Even before handcuffing petitioner, Sergeant Cueto detected an odor of marijuana coming from his person.[65]

After handcuffing petitioner, Sergeant Cueto spoke to him, and, from about four feet away, smelled "a very strong" odor of raw marijuana coming from petitioner.[66] Cueto asked petitioner if he had marijuana, and petitioner said that he had some in a bag that had been on his shoulder.[67] Cueto asked petitioner if he could open the bag, and petitioner consented by saying "yes."[68] Inside the bag, Cueto found six cell phones, cords, a plastic stun gun, and a ziplock

---

[63]*Id*. at 904-05.

[64]Doc. 682 at 164-66.

[65]*Id*. at 168.

[66]*Id*. at 168-69.

[67]*Id*. at 169-70.

[68]*Id*. at 170.

baggie of marijuana.[69]  Cueto arrested petitioner for possession of marijuana.[70]

Sergeant Cueto then asked who owned the rolling suitcase, and petitioner said it was his.[71]  Cueto then asked petitioner what was in the suitcase, and petitioner said it contained tapes.[72]  Cueto then read petitioner his *Miranda* rights, and petitioner chose to have an attorney and not to speak further.[73]  Cueto then searched the suitcase and discovered in excess of $850,000 in United States currency.[74]

### Connection Between the Two Flights

During a subsequent investigation, LAPD Detective Dennis Packer determined that the December 23 and December 24 flights were connected.  He obtained the invoice from the company that had chartered the December 24 flight that had landed at Van Nuys Airport.[75]  This invoice showed that the plane left the Van Nuys airport on December 24, went to Cleveland, Ohio, then returned to Van Nuys on the same date.[76]  The cost of the charter was billed to "Individual Records" and "Heartless Records," both with addresses in Los Angeles.[77]  Packer learned that the president of Individual Records was petitioner, who had been stopped on the

---

[69]*Id*. at 170-71.

[70]*Id*. at 172.

[71]Doc. 688 at 975.

[72]Doc. 682 at 172-73.

[73]*Id*. at 173.

[74]*Id*. at 174-75.

[75]Doc. 688 at 1047.

[76]*Id*. at 1048-49.

[77]*Id*. at 1049.

December 24 flight; and the president of Heartless Records was Troy Barker, who had been stopped on the December 23 flight.[78]  In searching the stolen Escalade, Packer found three pay stubs to Brian Diaz from Individual Records.[79]  In Diaz's wallet, officers found a piece of paper with the name "Cornel," and a corresponding phone number; this was significant to Packer because he determined that Cornell Price was an attorney representing Barker.[80]  He determined that the other Escalade at the scene was registered to Melanie Adauto and was being driven by petitioner.[81]  He also determined that Barker, Diaz and petitioner were half-brothers.[82]

### *Brian Diaz Testimony*

Diaz testified at trial that he worked for Barker from 2001 to 2002 by transporting both money and drugs for him.[83]  He testified that Barker sold marijuana and music for a living, and that all of his drug dealings were between Cleveland and Los Angeles.[84]  Upon learning of Barker's arrest, Diaz planned to go to Cleveland with Sean Gayle, an associate of Barker's to collect money owed to Barker; Gayle knew where to go in Cleveland to collect the money.[85]  Diaz wanted to get the money in order to get Barker out of jail, get him a good lawyer, and to

---

[78]*Id*. at 1050-51.

[79]*Id*. at 1059-61.

[80]*Id*. at 1070; Doc. 689 at 1160-61.

[81]Doc. 688 at 1071.

[82]*Id*. at 1087.

[83]Doc. 689 at 1283.

[84]*Id*. at 1227, 1288.

[85]*Id*. at 1289-90.

prevent Clarence Adolphus from getting it.[86]  Adolphus worked for Barker at Heartless Records, and Diaz assumed they were in the drug business together.[87]  On December 23, Diaz spoke with petitioner, told him of his plans to go to Cleveland, and asked petitioner to come along to help collect the money.[88]  Petitioner agreed to help and arranged for the flight to Cleveland.[89]  They left at approximately 1:00 a.m. on December 24.[90]  They arrived at the Cleveland airport around 7:00 a.m., where they met a man named "Bings," who put them in touch with a man named "Breeds," who brought them a suitcase full of money.[91]  Diaz checked into a hotel room with the money, while Bings, petitioner and Gayle left to find more contacts.[92]  While waiting for petitioner and Gayle to return, Diaz spoke with Barker's lawyer about Barker's legal situation.[93]  After a few hours, petitioner and Gayle returned with a little blue bag containing money, and Diaz put this bag in the suitcase.[94]  They all then left for the airport with the suitcase and flew back to the Van Nuys airport.[95]

---

[86]*Id*. at 1249-51.

[87]*Id*. at 1286-87.

[88]*Id*. at 1291-92.

[89]*Id*. at 1243, 1254.

[90]*Id*. at 1254-58.

[91]*Id*. at 1256, 1259-61.

[92]*Id*. at 1262-64.

[93]*Id*. at 1264-67.

[94]*Id*. at 1264, 1267-68.

[95]*Id*. at 1269-70.

Upon landing in Van Nuys, the three were met by officers who told them to "freeze."[96] One of the officers stated, "This SUV is stolen"; Diaz replied, "This SUV cannot be stolen because I'm the one who [sic] paying the note for this SUV."[97] The officer then explained that Dormer had reported the vehicle as stolen.[98] Diaz explained that he had assumed the lease on the vehicle from Dormer and had insured it in his (Diaz's) name, but the vehicle was still registered in Dormer's name.[99]

### *Testimony of Mitchell Hamilton*

Mitchell Hamilton is a half-sister to Troy Barker and Brian Diaz and a full-sister to petitioner and Faith Hamilton.[100] Mitchell testified at trial that petitioner moved out of their mother's house when he was seventeen years old and began working for Barker.[101] Barker maintained several "working houses" where he would store marijuana for packaging before shipping it out-of-state.[102] During this time, petitioner was "sitting on" the marijuana, making sure that nothing happened to it.[103] At some point, petitioner became dissatisfied with this arrangement, decided to find his own connection, and went out on his own.[104] Meanwhile,

---

[96]*Id*. at 1270-71.

[97]*Id*. at 1271.

[98]*Id*.

[99]*Id*. at 1271-72.

[100]Doc. 685 at 216-17.

[101]*Id*. at 270-71.

[102]*Id*. at 271-73.

[103]*Id*. at 275-76.

[104]*Id*. at 275-77.

Barker continued his drug business, which involved transporting marijuana to Cleveland, the

Carolinas, and New York, using a drug source in Arizona.[105]  After petitioner stopped working

for Barker and set up his own drug organization, the organizations "were completely separate

operations."[106]

After striking out on his own, petitioner would take trips back and forth between

California and Philadelphia, which involved transporting drugs on planes to Philadelphia and

returning with money.[107]  Some of these flights were arranged through Clarence Adolphus, who

ran an aviation company called Smooth Air.[108]  Adolphus chartered planes to both petitioner and

Barker for approximately $25,000 per trip, and at some point petitioner became upset because

Adolphus charged Barker less than what he charged petitioner.[109]  Petitioner chartered more than

five such flights.[110]  On one occasion, someone robbed petitioner of his drugs and he was

involved in a shootout.[111]  Petitioner also set up a record label company called Individual

Records.[112]

Mitchell Hamilton worked as the office manager at Investor's Link Financial Service

("Investor's Link"), a realty company owned by Mitchell's sister, Faith Hamilton, who arranged

---

[105]Doc. 686 at 365-66.

[106]*Id*. at 366-67.

[107]Doc. 685 at 288, 297-98.

[108]*Id*. at 297-98.

[109]*Id*. at 298-99.

[110]*Id*. at 300.

[111]*Id*. at 292.

[112]*Id*. at 302.

fraudulent loans and real estate transactions for family members and provided false W-2 forms to facilitate these transactions.[113]

Mitchell arranged the purchase of her home, a $600,000 residence, using false documents produced by Faith.[114]  To purchase this residence, Mitchell used $130,000 provided by petitioner as a down payment, which he provided to her in a duffel bag filled with cash.[115]  After Mitchell purchased the residence, petitioner asked for return of the money, which Mitchell repaid by securing a second mortgage on the residence.[116]  Mitchell repaid petitioner $100,000 and he forgave the remaining $30,000.[117]  Petitioner asked that the check be made out to his business, and Mitchell testified that she felt that petitioner used her to launder the $100,000 to make it "look legal."[118]

After Barker was arrested at the Salina airport, petitioner went to Cleveland to collect Barker's money for several reasons: 1) to get the money to keep Heartless Records going[119]; 2) to help Barker out with his legal situation[120]; and 3) to repay Barker's source in Arizona, Cathy, who "was being threatened and the money needed to be repaid."[121]  Before Barker was arrested,

---

[113]*Id*. at 246-47, 251-53; Doc. 686 at 416-25.

[114]Doc. 685 at 253-55.

[115]*Id*. at 259.

[116]*Id*. at 263-64, 266.

[117]*Id*. at 266.

[118]*Id*. at 268-69.

[119]*Id*. at 306-07.

[120]*Id*. at 306, 309.

[121]Doc. 686 at 370.

petitioner had no involvement with Barker's business, Heartless Records, but after Barker was arrested and jailed, petitioner took over Heartless Records and ran it, working out of Heartless Records's building.[122] This benefitted both Barker and Hamilton, because Barker's business was "staying afloat," and petitioner "had a studio home for his artists to record and also an office to work out of."[123]

### Testimony of Melanie Adauto

Melanie Adauto was petitioner's common-law wife and mother of his three children.[124] In 1997, while still dating, she and petitioner sometimes stayed the night at Barker's houses where Barker wrapped and packaged marijuana.[125] At this time, petitioner worked for Barker and "helped wrap weed for his brother."[126] The operation involved wrapping 50-pound boxes of marijuana with industrial-size Saran wrap and shipping it in crates bearing false return addresses.[127] Petitioner was involved in this shipping process.[128] In 1997, petitioner stopped working for Barker because his brother was not paying him enough and treated him more like a worker than a brother.[129] After 1997, petitioner had no business association with Barker.[130]

---

[122]*Id*. at 352, 370, 415.

[123]*Id*. at 416.

[124]Doc. 685 at 480.

[125]*Id*. at 482-84.

[126]*Id*. at 488.

[127]*Id*. at 489-92.

[128]*Id*. at 492.

[129]*Id*. at 515-16.

[130]Doc. 687 at 754.

By 2001, petitioner was trafficking marijuana from Los Angeles to the Philadelphia area, often using chartered jets to haul the drugs to Philadelphia and to transport the drug proceeds back.[131]  Petitioner initially chartered his flights through Clarence Adolphus, whom he paid $28,000 to $32,000 cash for each flight, but petitioner eventually switched to another aviation company.[132]  Petitioner's contact in Philadelphia was his cousin, whom he met through Faith.[133]  Petitioner brought back "suitcases full of money" from these trips, which contained $200,000 to $300,000 per trip.[134]  Petitioner would bring home this amount "at least once every couple of weeks" during a ten-to-twelve month period in 2001-2002, for a total of approximately $4,000,000.[135]  They used this money to pay their bills and petitioner used it to buy more drugs.[136]  They also used this money to buy expensive automobiles, including a Cadillac, a BMW and a Mercedes.[137]  They used $215,000 in drug proceeds as a down payment on a $927,000 home, which Faith helped them obtain with false documentation.[138]

Petitioner also started a record company, Individual Records.[139]  During the time that Adauto worked for this company, the business did not make any money and had significant

---

[131]Doc. 685 at 558, 562-63.

[132]*Id*. at 558-61.

[133]*Id*. at 561-62.

[134]*Id*. at 543.

[135]*Id*. at 631-32, 563.

[136]*Id*. at 545-46.

[137]*Id*. at 546-47.

[138]*Id*. at 538-42.

[139]*Id*. at 528.

overhead.[140]  Petitioner covered his overhead with cash from his drug proceeds.[141]

Adauto first learned of Barker's arrest in Salina around noon on December 23, 2002, when Faith called petitioner at their residence and told him about it.[142]  After the call, petitioner went to Faith's residence to speak to her, and upon returning told Adauto that they were going to come up with bail money to get Barker out of jail.[143]  Eventually, petitioner, Diaz, whom Adauto referred to as "Rocky," and Gayle chartered a flight to go to Cleveland to collect money owed to Barker.[144]  Upon being arrested at the Van Nuys airport, petitioner called Adauto and asked her to bail him out of jail, and he was released on Christmas morning.[145]

---

[140]*Id.* at 529-32.

[141]*Id.* at 531, 538.

[142]*Id.* at 564-65.

[143]*Id.* at 566-67.

[144]*Id.* at 570-71.

[145]*Id.* at 575-76.

**IV.     Discussion**

Petitioner seeks relief under § 2255 on seven grounds: multiple claims that his trial and appellate counsel provided ineffective assistance; that his Indictment was defective because it contained a conspiracy charge without a corresponding substantive count; and that he should not have been charged in federal court and instead, should have been charged with a misdemeanor marijuana charge under California state law.  Because petitioner did not raise any of the claims he presents in his § 2255 motion on direct appeal, the government argues that he has procedurally defaulted all of his claims unless he can show that his counsel ineffectively failed to raise them and that such failure prejudiced him, or that failure to consider the claim will result in a fundamental miscarriage of justice.

**A.     Ground One**

Petitioner claims in Ground One that he

> was arrested by local law enforcement in southern California when he landed at a private airport.  Law enforcement's foundation was based on a misdemeanor quantity of marijuana.  An uncondensed [sic] search uncovered nearly a million dollars in cash.  California has a drug statute which reached Hamilton's conduct.  In this case, did Congress overstep the Tenth Amendment?[146]

In his traverse, petitioner clarifies that because the underlying offense of the conspiracy charge under 21 U.S.C. § 846 was a misdemeanor, possession of marijuana in California, the charge is a violation of the Tenth Amendment because the government improperly converted the state misdemeanor to a federal felony offense.  Petitioner also provides the Court with a lengthy history and analysis of the Tenth Amendment.  This argument, however, is without merit.

---

[146]Doc. 990 at 4.

The government is correct that petitioner's claim is barred by the dual sovereignty doctrine, which provides "that the laws of separate sovereigns are indeed separate and that one act may violate the laws of each; accordingly, prosecution by each cannot be for the same offense and double jeopardy concerns are not implicated."[147] The "doctrine is . . . a manifestation of the maxim that where a defendant violates the law of two sovereigns, he commits separate offenses."[148]

In this case, petitioner's federal prosecution was proper under the dual sovereignty doctrine. Petitioner's claim that the government somehow formed the basis of its conspiracy charge on the misdemeanor possession of marijuana offense is misplaced. After connecting the Kansas and California flights, the government indicted petitioner and others for conspiracy to distribute more than 1000 kilograms of marijuana between 1994 and 2003, in violation of § 846, with reference to the substantive offenses set out in 21 U.S.C. § 841(a)(1) and (b)(1)(A). Thus, in possessing marijuana in California and violating the conspiracy law of the United States, petitioner violated two separate sovereigns, and the doctrine allowed his prosecution under the laws of both sovereigns. Petitioner's claim under Ground One fails.

## B.    Ground Two

Under Ground Two, petitioner argues that his conspiracy conviction is infirm because he was neither charged nor convicted of an underlying substantive offense. As the government asserts, this claim fails because "the crime of conspiracy is separate and distinct from the

---

[147]*United States v. Rammer*, 941 F.2d 1031, 1037 (10th Cir. 1991).

[148]*United States v. Barrett*, 496 F.3d 1079, 1118 (5th Cir. 2002); *see also United States v. Barrett*, 496 F.3d 1079, 1118 (10th Cir. 2007) (recognizing the dual sovereignty doctrine allows successive prosecutions by separate sovereigns for crimes arising out of the same underlying conduct).

substantive crime and a conspiracy conviction is not predicated on the commission of the substantive offense."[149]  As the Supreme Court explained, "[the Court has repeatedly said that the essence of a conspiracy is 'an agreement to commit an unlawful act.'  That agreement is 'a distinct evil,' which 'may exist and be punished whether or not the substantive crime ensues.'"[150]  Thus, because the government did not need to prove that petitioner committed the substantive drug offense to convict him of conspiracy to commit that offense, it follows that it was not required to charge him with that offense, as petitioner contends.

Moreover, the "doctrine of constitutional avoidance" does not help petitioner, as this is a canon of statutory construction that only applies where a statute may be interpreted in more than one way, which is not the case here.[151]  No issue of statutory interpretation is implicated by petitioner's claim, and Ground Two also fails.

## C.    Ground Three

Petitioner asserts in Ground Three that his trial counsel was ineffective in two respects: (1) by failing to challenge the Indictment on the basis that it did not contain a substantive count, and (2) by ineffectively cross-examining the government's witnesses at trial.  The first claim fails for the reasons set forth above in the dismissal of Ground Two.

Petitioner's second claim also fails.  As the Tenth Circuit has explained, counsel's choice

---

[149]*United States v. Fell*, 511 F.3d 1035, 1042 (10th Cir. 2007).

[150]*United States v. Geminis Recco*, 537 U.S. 270, 274 (2003) (internal citations omitted).

[151]*See Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("The canon of constitutional avoidance come into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction. . . .").

of cross-examination question is a tactical decision.[152]  Here, petitioner fails to present any

specific or particularized facts that this Court may consider as a basis for his claim.  He does not

identify any specific witnesses called by the government whom his counsel failed to effectively

cross-examine, nor does he suggest to this Court any questions that his counsel should have

asked, but did not, that would have changed the result of the trial.  Accordingly, petitioner fails

to carry his burden to show that his counsel performed deficiently, and that he suffered the

necessary *Strickland* prejudice as a result.[153]  Ground Three is dismissed.

D.    **Ground Four**

Petitioner contends in Ground Four that,

> A recent Supreme Court ruling now plainly shows the search by
> law enforcement at the airport is illegal where the exigent
> circumstances were law enforcement created.  It is uncontested
> Hamilton specifically refused to allow the police at the airport to
> search his bag.  Despite the lack of consent, law enforcement
> created an exigent circumstance where they sought [sic] a search
> was necessary.  The Supreme Court just recently ruled a police
> created exigent circumstance like the one present is not permitted
> by the Fourth Amendment.  Does this new ruling invalidate the
> conviction?[154]

The Court's analysis is hampered because petitioner does not identify the recent case he

---

[152]*See, e.g.*, *United States v. Pena*, 920 F.2d 1509, 1520 (10th Cir. 1990) (stating that failing to cross-examine a witness constitutes a strategic choice); *United States v. Snyder*, 787 F.2d 1429, 1432 (10th Cir. 1986) (stating that counsel's choice of cross-examination questions is a tactical decision); *United States v. Miller*, 643 F.2d 713, 714 (10th Cir. 1981) (stating that whether to call a witness is a tactical decision).

[153]*See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995) ("To be entitled to an evidentiary hearing on claims raised in a habeas petition, the petitioner must allege facts which, if proved, would entitle him to relief."), *overruled in part on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001) (en banc).

[154]Doc. 990 at 8.

relies upon.[155]  It appears that he is referring to *Arizona v. Gant*,[156] which was issued while his appeal was pending, and which he cited in his *pro se* petition for rehearing with the Tenth Circuit.  *Gant* held that it is only reasonable to conduct a vehicle search incident to a lawful arrest if the arrested is unsecured and within reaching distance of the passenger compartment at the time of the search (or if evidence of the crime might be found in the vehicle).[157]

Petitioner argues that although he consented to the search of his shoulder bag at the Van Nuys airport, the officers unlawfully searched his suitcase, which contained over $800,000.  As discussed above, when the officers encountered Diaz, Gayle and petitioner at the airport, they handcuffed them because of their obvious nervousness.  Sergeant Cueto detected an odor of marijuana coming from petitioner's person and when he asked if petitioner had any marijuana, petitioner replied that he had some in his shoulder bag.  Petitioner then consented to the search of the shoulder bag, which contained six cell phones, cords, a plastic stun gun and a ziplock baggie containing marijuana.  This Court held that the subsequent search of the suitcase was justified by the intervening discovery of the marijuana in the shoulder bag and the arrest of petitioner[158]; the Court's ruling denying petitioner's motion to suppress on the grounds that he did not consent to the searches was affirmed by the Tenth Circuit.[159]  *Gant* does not present the legal issue before the trial court: that he did not consent to the search of his luggage, and petitioner does not even

---

[155]The government speculates that petitioner is referring to *Kentucky v. King*, 536 U.S. —, 131 S. Ct. 1849 (2011); however, that case was decided on May 16, 2011, one month after petitioner filed the instant motion.

[156]556 U.S. 332 (2009).

[157]*Id*. at 1718-19.

[158]Doc. 682 at 402.

[159]Doc. 934 at 27-28.

attempt to explain how it does.[160]  Accordingly, petitioner has failed to show that his counsel's representation fell below constitutional standards.

Even assuming that petitioner's counsel performed deficiently by not citing to *Gant* on appeal, he does not bear his burden to show that any such deficient performance prejudiced him under *Strickland's* second prong.  Petitioner does not argue that he was prejudiced on this basis, nor does he attempt to demonstrate that but for counsel's failure to raise this claim the result of the appeal would have been different.  Ground Four is denied.

### E.      Ground Five

Petitioner argues that Count One as charged under 21 U.S.C. § 846 was unconstitutionally vague because it "facilitates an opportunistic and arbitrary prosecution" and suffers from "lack of guidance."  The Court rejects this claim.

Even if petitioner has identified a potential issue that his counsel could have raised, he does not bear his burden to show that an as-applied challenge would have been meritorious. "The Fifth Amendment guarantees every citizen the right to due process.  Stemming from this guarantee is the concept that vague statutes are void."[161]  The vagueness doctrine recognizes that "[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."[162]  "[The void-for-vagueness doctrine requires

---

[160]Indeed, petitioner's appellate counsel attempted to raise new arguments regarding the suppression issue for the first time on appeal, but the Tenth Circuit deemed them waived.  *United States v. Hamilton*, 587 F.3d 1199, 1215-16 (10th Cir. 2009).

[161]*Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926).

[162]*Id.*

that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[163]  To survive a vagueness challenge, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[164]  "Where. . . a vagueness challenge does not involve First Amendment freedoms, we examine whether the provision is impermissibly vague in the light of the facts of the case at hand."[165]

The Court agrees with the government that in light of these standards, any as-applied challenge to Count One would have failed.  As applied to petitioner in light of the facts of this case, § 846 cannot be characterized as vague.  Section 846 states that "[a]ny person who . . . conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of . . . conspiracy." The applicable subchapter, 21 U.S.C. § 841(a)(1), makes it unlawful for any person to "knowingly or intentionally . . . to manufacture, distribute, or dispense, . . . . a controlled substance."  Based on the acts charged in Count One, the government was bound to prove that from sometime prior to January 18, 1994, to November 5, 2003, petitioner "knowingly, willfully and unlawfully . . . conspired [with various co-defendants] to distribute controlled substances, including but not limited to more than 1,000 kilograms of marijuana and more than 5 kilograms

---

[163]*Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

[164]*Id.*

[165]*United States v. Bennett*, 329 F.3d 769, 777 (10th Cir. 2003) (internal quotations omitted).

of cocaine," in violation of these statutes.[166]  Nothing about this charge is vague to an ordinary person of common intelligence, and petitioner does not explain what he did not understand about the charge, other than to reiterate that he was not charged with a substantive offense.  The statute prohibits the distribution of controlled substances and Count One specifically alleged that petitioner conspired to distribute controlled substances, marijuana and cocaine.

Moreover, the government was required to prove that petitioner's agreement to distribute these substances was knowing or intentional, which cuts against any claim that petitioner could have been convicted without knowing the criminality of his conduct.[167]  Neither the terms of § 846 nor the terms of Count One evince a lack of clarity about key statutory terms nor a risk that those terms would be applied on an ad hoc or subjective basis in an arbitrary and discriminatory manner.  Accordingly, there is no vagueness issue here, and petitioner has failed to meet the prejudice prong of *Strickland*.  Ground Five is dismissed.

### F.    Ground Six

Citing *Padilla v. Kentucky*,[168] petitioner asserts that he receive ineffective assistance from his trial counsel on the basis that she did not adequately investigate his case, and that such failure resulted in his being tried on a federal conspiracy charge instead of pleading to a misdemeanor offense of marijuana possession.  He further asserts that he was prejudiced by such failure to investigate because he now faces deportation from the United States after he finishes serving his sentence.  This claim lacks merit.

---

[166]Doc. 264.

[167]*See United States v. Evans*, 318 F.3d 1011, 1017 n.3 (10th Cir. 2003) (holding "the fact that a particular statute contains a mens rea element may militate against a finding of vagueness").

[168]—U.S.—, 130 S. Ct. 1473 (2010).

First, as the government points out, no amount of investigation by counsel could have prevented petitioner from being charged and convicted in federal court on the instant charges, as opposed to a state misdemeanor charge in California. As previously discussed in the analysis of Ground One, the dual sovereignty doctrine permitted the federal government to charge and convict petitioner of the instant federal charges in federal court. Petitioner's counsel could not have changed this fact through any amount of investigation, so her alleged failure to investigate did not constitute deficient performance or prejudice petitioner.

Moreover, *Padilla* has no application to this case because petitioner did not enter into a plea. In *Padilla*, the narrow issue before the Supreme Court was whether the state court properly denied an alien defendant post-conviction relief on the ground that "the Sixth Amendment's guarantee of effective assistance of counsel does not protect a criminal defendant from erroneous advice about deportation because it is merely a 'collateral' consequence of his conviction."[169] The Court concluded that the state court erred, holding that before a non-citizen criminal defendant enters a guilty plea, counsel has a duty under the Sixth Amendment to inform him "whether his plea carries a risk of deportation."[170] Having determined the defendant's counsel had a duty under the Sixth Amendment to provide accurate advice about the risk of deportation, the Court applied *Strickland's* two-part test to determine whether counsel's erroneous advice deprived the defendant of effective assistance of counsel, and remanded the action to the state court.[171] In this case, petitioner did not enter a plea, so his counsel had no occasion to advise him

---

[169]130 S. Ct. at 1478.

[170]*Id.* at 1486.

[171]*Id.* at 1482-85.

of the deportation consequences of a plea.  Ground Six is denied.

### G.    Ground Seven

Finally, petitioner claims his appellate counsel was ineffective for failing to raise certain claims in his direct appeal before the Tenth Circuit.  Again, the Court's analysis is hampered by petitioner's failure to identify the precise issues that he believes his counsel should have raised; nor does he attempt to demonstrate that the issues were meritorious and would have changed the outcome of the proceedings below.  The Court can only surmise that petitioner is referring to counsel's failure to cite to *Arizona v. Gant*.  As discussed in the analysis of Ground Four, this claim lacks merit, and Ground Seven is also dismissed.

## V.    Certificate of Appealability

Effective December 1, 2009, Rule 11 of the Rules Governing Section 2255 Proceedings requires the Court to grant or deny a certificate of Appealability ("COA") when making a ruling adverse to the petitioner.  "A certificate of Appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[172]  A petitioner may satisfy his burden only if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[173]  A petitioner is not required to demonstrate that his appeal will succeed to be entitled to a COA.  He must, however, "prove something more than the absence of frivolity or the existence of mere good faith."[174]  "This threshold inquiry does not

---

[172]28 U.S.C. § 2253(c)(2).  The denial of a § 2255 motion is not appealable unless a circuit justice or a circuit or district judge issues a certificate of appealability.  *See* Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[173]*Said v. Ortiz*, 393 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Lennard v. Dretke*, 524 U.S. 274, 282 (2004)).

[174]*Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

require full consideration of the factual or legal bases adduced in support of the claims.  In fact, the statute forbids it."[175]  For the reasons detailed in this Memorandum and Order, petitioner has not made a substantial showing of the denial of a constitutional right, and the Court denies a COA as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that petitioner Clive Hamilton's Motion to Vacate pursuant to 28 U.S.C. § 2255 (Doc. 990) is DENIED; Hamilton is also denied a COA.

**IT IS SO ORDERED.**

Dated: October 25, 2011

 S/ Julie A. Robinson_____
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[175]*Id.* at 336; *see also United States v. Silva*, 430 F.3d 1096, 1100 (10th Cir. 2005).